UNITED STATES of America, Plaintiff-Appellee,

v.

Thomas Earl DAVIS, Defendant-Appellant.

No. 85–9006.

United States Court of Appeals, Eleventh Circuit.

Feb. 13, 1987.

Ronnie Joe Lane, Donalsonville, Ga., for defendant-appellant.

Joe D. Whitley, U.S. Atty., John L. Lynch, Asst. U.S. Atty., Macon, Ga., Torrence R. Thomas, Jr., Dept. of Justice, Civil Div., Washington, D.C., for plaintiff-appellee.

Before VANCE and EDMONDSON, Circuit Judges, and ALLGOOD *, Senior District Judge.

VANCE, Circuit Judge:

This appeal results from a suit by the government arising out of a defaulted disaster loan. Thomas Davis appeals a judgment notwithstanding the verdict which awarded the government damages under the False Claims Act, 31 U.S.C. § 3729, and a directed verdict in favor of the government on its claim that Davis misapplied loan proceeds in violation of 42 U.S.C. § 5157. We reverse the judgment n.o.v. and affirm the directed verdict.

## I.

In the summer of 1977, a severe drought caused Georgia farmers to suffer extensive crop losses. Congress appropriated funds for making disaster loans through the Farmer's Home Administration (FmHA) and the Small Business Administration (SBA). Thomas Davis, who had sustained losses due to the drought, sought a disaster loan from both federal agencies. On January 4, 1978, Davis closed a FmHA emergency loan: he pledged certain property to the FmHA as security and received $331,000.

The next day, Davis closed a $194,900 disaster loan with the SBA. To secure this debt, Davis pledged the same property that he had just pledged to secure the FmHA loan. Davis did not disclose this prior in-

---

* Honorable Clarence W. Allgood, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

terest in the property when he executed the "SBA Owner's Affidavit." Davis also executed a "Settlement Sheet," in which he certified that "the proceeds of this disbursement will be and all previous disbursements have been used, in accordance with the Loan Authorization."[1] The "Loan Authorization" provided that Davis was to use half of the loan proceeds to pay two named creditors and the remainder to plant the following year's crops.[2] In fact, Davis had already used the proceeds of his FmHA loan, received one day previously, to pay these creditors.

Davis defaulted on the SBA loan, and the United States filed this suit seeking recovery. Count I of the complaint sought recovery of the principal and interest on the defaulted loan. Count II sought damages in the amount of one and one-half times the loan amount plus interest for misapplication of SBA loan proceeds in violation of 42 U.S.C. § 5157. Count III sought double damages for false and fraudulent statements in violation of the False Claims Act, 31 U.S.C. § 3729.[3]

The case was tried before a jury. From bank records and cancelled checks, the government traced the movement of the loan proceeds. The government established that Davis used $90,000 in SBA loan proceeds to purchase land and a house. Davis had obtained an option to purchase this property nearly two months before the loan closing. The government also introduced evidence to show that Davis directed an additional $43,000 in loan proceeds towards unauthorized purposes such as remodelling his house and making payments on his boat.

In his defense, Davis offered only his own testimony. He testified that at the time he executed the documents closing the SBA loan, he told the SBA representative that he had already paid his creditors.[4] Davis swore that he was not aware that it was wrong to use his SBA disaster loan to buy a house and land. This statement was impeached by Davis' earlier sworn statements before the United States Senate.[5] Davis also testified that he had obtained some of the funds in question "from selling cows, different things". His bank records showed no such deposits.

The government moved for directed verdicts on all counts, but the court submitted all three counts to the jury. The jury returned a verdict for the government on Count I, a verdict for Davis on Count III, and was unable to reach a verdict on Count II. The court then granted the government a directed verdict on Count II and a judgment notwithstanding the verdict on Count III. Davis appeals the judgments entered in favor of the government on Counts II and III.

---

1. The settlement sheet also contained a declaration "that there has been no substantial adverse change in the financial condition, organization, operations, or fixed assets, since the application for this loan was filed."

2. The closing documents also included an interest-bearing note in the amount of $194,900. This note contained the following provision: "The undersigned understands and agrees that in the event he wrongfully misapplies the proceeds of the loan obtained, he shall be civilly liable to the Administration in an amount equal to one and one-half (1½) times the original principle [sic] amount of the loan."

3. Other counts sought restitution, recovery for unjust enrichment, and recovery for payment by mistake. The Court reserved these additional counts for its own decision, eventually determining that they were moot in light of the judgments on the first three counts.

4. No SBA representative expressly denied Davis' assertion. The closing documents, however, make no mention of this disclosure. The government also attempted to impeach Davis with his testimony before the Senate Committee for Small Business in 1981 in which Davis stated:

 Senator Weiker: Mr. Davis, you executed an affidavit for the SBA loan on January 5, 1978 and you did not list the FmHA loan?
 Mr. Davis: Nobody asked me if I had an FHA loan.

5. The testimony used to impeach Davis was as follows:

 Senator Nunn: Did you think you were authorized under the SBA loan to use the $90,000 for the purchase of land?
 Mr. Davis: I did not, really.

## II.

We first turn to the government's claim under the False Claims Act. The government contends that it established its case with uncontroverted evidence: at the time of the SBA loan closing, Davis was already planning to apply SBA loan proceeds to uses other than those specified in the Loan Authorization. Davis admitted as much in court. The defendant, however, contests the significance of this fact. Davis maintains that the False Claims Act requires a specific intent to defraud the government and that his testimony supports a jury finding that he lacked this state of mind.

 Scienter—the intent to deceive—has always been an essential element of common law fraud.[6] W. Prosser, Law of Torts 685–86, 700–04 (4th ed. 1971). The False Claims Act incorporates this requirement: the Act penalizes only those who act "knowingly." 31 U.S.C. § 3729; *see United States v. Mead,* 426 F.2d 118, 122–23 (9th Cir.1970). Since similar language in the predecessor statute has been interpreted as predicating liability upon the specific intent to defraud the government, *see United States v. Aerodex, Inc.,* 469 F.2d 1003, 1006–07 (5th Cir.1972); *United States v. Ridglea State Bank,* 357 F.2d 495, 498 (5th Cir.1966); *see also United States v. Ueber,* 299 F.2d 310, 314 (6th Cir.1962),[7] we conclude that the present statute also requires a specific intent to work a deceit upon the government.

 The issue at the heart of this case is whether the defendant's self-serving testimony, by itself, created a jury question with respect to his state of mind. To create a jury question, the conflicting evidence must be "substantial." *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc). There is no doubt that a fact finder could easily infer that a man who supplied false and incomplete information to the SBA—and then misapplied the loan proceeds—had intended all along to defraud the SBA. Nonetheless, if the jury believed the defendant's testimony, it could reasonably have come to the opposite conclusion. Davis testified that he did not have adequate time to scrutinize the documents at the closing because of the rushed and confused atmosphere. Davis also told the court that when he tried to correct a false statement, a government official assured him that this would not be necessary. According to the defendant's version of events, he is at worst guilty of carelessness in completing the loan documentation.[8] This version is not entirely inconsistent with the evidence presented by the government. We cannot say that the facts and inferences point so strongly in favor of the government that reasonable men could not arrive at a verdict for the defendant. *See Boeing Co. v. Shipman,* 411 F.2d at 374–75 & n. 16.

 It is the function of the jury to observe demeanor and listen to testimony

6. "No statute is to be construed as altering the common law, farther than its words import. It is not to be construed as making any innovation upon the common law which it does not express." *Shaw v. Railroad Co.,* 11 Otto 557, 565, 101 U.S. 557, 565, 25 L.Ed. 892 (1879).

7. *But see United States v. Hughes,* 585 F.2d 284 (7th Cir.1978); *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47 (8th Cir.1973).

8. For example, the trial transcript reveals the following exchange:
Government: ... You know what the loan proceeds were to be used for at the closing, did you not?
Davis: Right.
Government: And you certified when you signed the settlement sheet that that's what

you were going to use those proceeds for, didn't you?
Davis: We signed so many papers that you didn't know what you signed.
Government: Let me show you what you signed.
Davis: I know I probably, I know I signed it. You couldn't read all them papers. They were running you through there like a bunch of cows.
Government: That's what you signed.
Davis: Okay.
Government: You knew when you signed that what those proceeds were going to be used for, didn't you?
Davis: All Right. I told them I didn't owe them at that time, and he said just get them countersigned.

in order to determine the credibility of witnesses. *Id.* The government urges, nevertheless, that we should discount Davis' testimony because unsupported, self-serving testimony is not "substantial" evidence sufficient to create a jury question. We disagree. To be sure, there is language in some of our cases to this effect. Yet these cases appear to fall into two groups. In the first group, there exists overwhelming direct evidence to contradict the self-serving testimony. *See, e.g., New England Merchants National Bank v. Rosenfield,* 679 F.2d 467 (5th Cir. Unit B 1982) (plaintiff's testimony contradicted by "unimpeachable" witnesses and documentary evidence), *cert. denied,* 459 U.S. 1173, 103 S.Ct. 819, 74 L.Ed.2d 1017 (1983); *Ralston Purina Co. v. Hobson,* 554 F.2d 725, 729 (5th Cir.1977) (plaintiff's testimony "thoroughly discredited by the testimony of both expert poultry nuitritionists ... and physical facts"); *cf. Comfort Trane Air Conditioning v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir.1979) (overwhelming contradictory evidence). The language in these cases reflects a determination that the evidence in its entirety points strongly and irresistibly in favor of one party. *See Boeing Co. v. Shipman,* 411 F.2d at 374.

The second group of cases illustrates the rule that "[a] mere scintilla of evidence is insufficient to present a question for the jury." *Id.* These courts confronted testimony that was so fantastic, so internally inconsistent, or so speculative that it had no probative value. *See, e.g., United States v. Generes,* 405 U.S. 93, 106, 92 S.Ct. 827, 834, 31 L.Ed.2d 62 (1972) (self-serving claim of business motivation in tax case did not "bear the light of analysis"); *Chrysler Credit Corp. v. J. Truett Payne, Inc.,* 607 F.2d 1133, 1137 (5th Cir.1979) (plaintiff's testimony was merely unsupported "speculation or guess work"); *Yoder Brothers, Inc. v. California—Florida Plant Corp.,* 537 F.2d 1347, 1371 (5th Cir. 1976) (plaintiff's speculation insufficient to establish fact of damage in an antitrust suit), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). This second group, like the first, does not stand for the principle that a trial judge may take a case away from the jury simply because he doubts the credibility of a witness.

The present case stands apart from those discussed above. There is no evidence that directly contradicts the defendant's depiction of his mental state. We may disbelieve Davis' testimony, but we cannot say that it is so fantastic, speculative or inconsistent that it "falls of its own weight." *See United States v. Generes,* 405 U.S. at 107, 92 S.Ct. at 835. It is not uncommon to find that a defendant can muster only his own testimony to rebut circumstantial evidence of intent. We are unwilling to discount an explanation from the one person who can best describe the defendant's state of mind. We therefore reverse on Count III, the False Claims Act charge, and direct that judgment be entered in accordance with the jury's verdict.

### III.

■ Count II presents a similar set of issues. Under 42 U.S.C. § 5157, the "knowing" misapplication of loan proceeds is punished. Davis again claims that his testimony supports a jury finding that he lacked the requisite state of mind to support a conviction. We must disagree.

Davis admitted in sworn testimony before the Senate that he knew his use of the loan proceeds was not authorized. This earlier testimony directly contradicts Davis' courtroom assertions of ignorance. In addition, the government produced testimony from an SBA agent that Davis had admitted that he had been wrong in misapplying the loan proceeds. Finally, the government presented evidence that Davis was an experienced borrower of funds and that he knew the terms of the SBA agreement. An overwhelming mass of direct and circumstantial evidence supports the finding that Davis had formed the necessary intent. Under these circumstances, Davis' courtroom statements did not create a "conflict in substantial evidence." *See Boeing Co. v. Shipman,* 411 F.2d at 375.

We affirm the judgment of the district court on Count II.

AFFIRMED in part. REVERSED and REMANDED in part.