**Terry J. BAKER, Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

**No. 90–C–0235.**

United States District Court,
E.D. Wisconsin.

April 5, 1991.

John F. Maloney, McNally, Maloney & Peterson, S.C., Milwaukee, Wis., for plaintiff.

Robert F. Johnson and Thomas N. Harrington, Cook & Franke, S.C., Milwaukee, Wis., for defendant.

## DECISION AND ORDER

WARREN, Chief Judge.

The parties' cross-motions for summary judgment are before the Court.

### I. PROCEDURAL BACKGROUND

Baker filed this action on March 8, 1990, alleging *inter alia* that Amoco violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801 *et seq.*, by terminating and not renewing his franchise. Amoco filed its answer and counterclaim on April 3, 1990. By a stipulation and *Order* of July 13, 1990, the Court dismissed the counterclaim with prejudice and without costs. On October 11, 1990, the Court ruled that Baker is entitled to a jury trial in this action. 751 F.Supp. 1357 (E.D. Wis.1990).

### II. FACTUAL BACKGROUND

#### A. *Undisputed Facts*

Amoco's independent dealers operate service stations which sell gasoline and petroleum products pursuant to certain contracts. Drohan Aff. ¶ 2. Baker is an Amoco lessee-dealer who operates four Milwaukee County Amoco stations: (1) 200 North 35th Street; (2) 4405 West Layton; (3) 5100 South 108th Street; and (4) 10636 West

Bluemound Road. Amoco owns the first three of these stations and leases them to Baker, who operates them. A master lease covers the first station, and a multi-lease rider incorporates the second two stations. Vol. II T. Baker Depo. at p. 9; Ex. 3. Baker owns the fourth station and leases it to Amoco, which leases the station back to Baker. Vol. II T. Baker Depo. at pp. 7–8; Ex. 4. Baker's agreements with respect to all four stations include dealer supply agreements and Meter Marketing Plan agreements ("MMP"). The leases contain identical termination and nonrenewal provisions. Paragraph 15 thereof states:

Lessor shall have the right to terminate or nonrenew this lease, and any applicable franchise relationship under the Petroleum Marketing Practices Act or other applicable federal, state or local act of similar nature if any of the following events shall occur:

(a) Breach of any provision of this lease by lessee.

. . .

(d) Commission by Lessee or any of Lessee's employees or agents of any deceptive, . . . or other improper act relevant to the operation of the business on the premises which is detrimental to the Lessor . . . including without limitation . . . misrepresentation in pump meter readings, and/or reporting thereof, . . .

(e) Failure by Lessee to pay to Lessor in a timely manner when due all sums to which Lessor is legally entitled.

Paragraph 16(d) thereof states:

For purposes of the foregoing and any statute governing termination and nonrenewal, all provisions hereof granting rights of termination and nonrenewal to Lessor shall be construed as imposing on Lessee an affirmative duty to take action to avoid the event which justifies Lessor's exercise of a right of termination or non-renewal, regardless of whether or not the provision is expressly stated in terms of an affirmative duty.

The lease agreements covered three years, ending on November 30, 1989.

Under the Meter Marketing Plan, Amoco delivers gasoline to a dealer's underground storage tanks. The dealer does not pay Amoco for the gasoline until after it has been sold to the public. Amoco owns the gasoline in the underground storage tanks. Title to the gasoline passes to the dealer as it flows through the pump meters when it is sold to the consumer. Drohan Aff. ¶ 8; MMP Agreement ¶ 4. The wholesale price of the gasoline to the dealer at sale time and the amount of money due for gasoline withdrawn from the storage tanks is determined by pump meter readings. The dealer accounts for gasoline he purchases by preparing and providing pump meter reading reports. Dealers prepare these MMP reports roughly three times per week and mail them to Amoco along with the dealer's payment for the gasoline purchased during the reporting period. Drohan Aff. ¶ 9.

The dealer pays Amoco the price of the gasoline in effect at the time the gasoline flows through the dealer's pump meters. See Dealer Supply Agreements at ¶ 4; MMP Agreements ¶¶ 4–5. The wholesale price of Amoco's gasoline consigned to its dealers fluctuates. All Amoco dealers must file an MMP price change report when wholesale prices change. Drohan Aff. ¶ 9. The dealer must read his meters when the wholesale price changes to establish a cut-off point for the new pricing. The dealer purchases gasoline flowing through the pump meters after the price change at the new wholesale price. Id.

It is possible for dealers to manipulate wholesale prices. If the price increases, a dealer can: (a) "read ahead" by falsely overstating in the MMP report the number of gallons of gasoline sold immediately before the price increased; the dealer thus pays for fewer gallons at the higher price (Vol. I T. Baker Depo. at pp. 31–32, Drohan Aff. ¶ 11); and (b) make a "delayed report" of meter readings on the MMP report, thereby buying all gasoline pumped between the price increase and the time of the delayed reading at the previous lower price (Drohan Aff. ¶ 12). If the price decreases, a dealer could: (a) "back read" by falsely underreporting the number of gal-

lons of gasoline sold immediately before the price decrease and overreport the number of gallons of gasoline sold in the period immediately after the price decrease (Vol. I T. Baker Depo. at p. 32); and (b) report as price change readings meter readings taken before the price decrease became effective, thereby buying all gasoline dispensed between the time of the reading and the time of the price decrease at the lower price (Drohan Aff. ¶ 13).

Amoco announces price changes to its dealers by telephone. Drohan Aff. ¶ 10. These changes are announced as becoming effective at 12:01 a.m. on the day following the announcement. *Id.;* Vol. I T. Baker Depo. p. 9; Mesich Depo. pp. 31–35. When prices change, dealers are to read their pump meters, submit an MMP price change report, and pay Amoco for all gasoline dispensed before the price change. Under the dealer supply agreements and the MMP agreements, dealers are to pay Amoco at the new price for all gasoline dispensed after 12:01 a.m. Drohan Aff. ¶ 9.

At 12:01 a.m. on December 19, 1989, Amoco increased its wholesale price for unleaded regular gasoline by 4¢ per gallon. During the afternoon of that day, Diana Baker, the plaintiff's wife and a full-time employee of the plaintiff, prepared and mailed to Amoco an MMP price change and regular report of the amount of gasoline purchased at the 35th Street station before the December 19th price change. The time of the report is 12:01 a.m. on December 19th. D. Baker Depo. pp. 13–18; Ex. 8–C. Mrs. Baker entered five separate meter readings on this report which did not reflect actual pump meter readings and overstated the amount of gasoline sold before the price increase by approximately 4,000 gallons. Vol. I T. Baker Depo. pp. 24–27; Ex. 8–C; D. Baker Depo. pp. 13–18.

Peter Feeney, Amoco territory manager, discovered the overstated meter readings on the December 19th MMP price change and regular report during an audit performed at the 35th Street station on December 21, 1989. Feeney Aff. ¶¶ 3–6. Feeney read the pump meters at the 35th Street station and recorded the readings on the MMP audit report. Feeney Aff. ¶ 2; Ex. 8–D. Feeney compared the meter readings he had taken on December 21st with those on Baker's December 19th report. The comparison yielded that five of Baker's readings exceeded Feeney's readings taken two days later. The same comparison revealed that Baker's readings on December 21st were also inaccurate. Feeney Aff. ¶¶ 4–7. Feeney examined Baker's MMP reports from the 35th Street station for December 1989 and concluded that Baker was manipulating his reports to capitalize on price changes. Feeney reached the same conclusion after examining Baker's other three stations. *Id.* Based on these alleged misrepresentations and failures to comply with the extant agreements, Amoco sent notices of termination to Baker on January 17, 1990. Drohan Aff. ¶ 1; Ex. 2.

As for the parties' dispute over the rental rebates in July 1989, the subject of Baker's previous lawsuit against Amoco in this Court, Baker's Amoco leases included a provision that he would operate the stations 24 hours per day. Under this provision Baker qualified to participate in Amoco's "24–hour rental rebate program." Under this program Baker received as an incentive a 20% discount on the monthly rent due to Amoco. Baker received the 24–hour rental rebate despite the fact that he did not operate the Hales Corners and Loomis stations 24 hours per day in early to mid-1989. Amoco sent Baker Notices of Non-Renewal based upon this conduct on May 19, 1989. Baker sued Amoco under the PMPA in Case No. 89–C–965, an action assigned to this Court. The parties resolved this litigation pursuant to a Settlement Agreement. In that agreement Baker did not admit liability, § 3.1, but he did acknowledge that he did not keep the stations open 24 hours per day. Baker repaid Amoco $2,539.20 in full satisfaction of any and all claims to reimburse for Rental Rebates due under the present lease. Settlement Agreement § 2.7, November 15, 1990 (Maloney Aff. Ex. A). *See generally* December 14, 1990 Harrington Aff. Ex. A–C.

On January 17, 1990, Amoco mailed Baker notices of non-renewal and termination for all four of his stations. The stated grounds were:

(1) You have reported incorrect meter readings on MMP reports to defraud and cheat Amoco of the full amount due for gasoline. This includes, but is not limited to, your report of false readings on your MMP report regarding [the] service station [at 200 North 35th Street] on the 19th of December, 1989.

(2) You have failed to properly report gasoline sales required by your agreements with Amoco.

(3) You have committed fraud or criminal misconduct relevant to the operation of the marketing premises.

(4) You have failed to pay Amoco in a timely manner when due, all sums to which Amoco is legally entitled.

(5) An event has occurred which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of franchise relationship is reasonable.

(6) You have failed to comply with a provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship.

November 15, 1990 Baker Aff. Ex. A & B. Under the PMPA, Amoco had to give Baker 90 days notice of the proposed termination. The notices therefore became effective April 19, 1990.

B. *Disputed Facts*

1. Amoco

Amoco states that during 1989, Baker never read the pump meters at any of his stations at 12:01 a.m. in preparation of an MMP price price change report. Mesich Depo. pp. 34, 58. Thomas Mesich, the supervisor for Baker's stations who read the meters when a price change occurred, avers that when prices would increase, Baker employees would delay in reading the meters after the price change became effective. Mesich Depo. pp. 32–34; .46–50.

2. Baker

Baker alleges that the notices of non-renewal and termination failed to identify one of the real reasons for the termination of the franchise relationship: the incident of alleged fraud which was the subject of prior litigation between the parties that was dismissed with prejudice and without

admission of liability on October 30, 1989. *See supra* pp. 1389–90. Baker points out that the ·author of the notices, Matthew Drohan, District Manager for Amoco, testified that he had issued the notices because of the December 19, 1989 circumstances, as well as based upon a prior instance of alleged fraud. Baker notes that the rental rebate issue applied to only two of Baker's four gasoline stations, and that it arose as a result of Baker's safety concerns about operating the stations on a 24–hour basis without standard pass-thru drawers.

### III. STANDARD OF REVIEW

The Court will grant a summary judgment motion only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a summary judgment motion, the Court views the record and all inferences drawn therefrom in the light most favorable to the nonmovant. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue for trial. *Weihaupt v. American Medical Assoc.*, 874 F.2d 419, 424 (7th Cir.1989) (citations omitted). In determining whether a genuine issue of material fact is present, the Court must consider the substantive law at issue and the burden of proof under that law. *Id.* (quoting *Williams v. Williams Elecs.*, 856 F.2d 920, 922 (7th Cir.1988)).

### IV. PLAINTIFF'S SUMMARY JUDGMENT MOTION

A. *Parties' Arguments*

Baker offers two main arguments in support of his summary judgment motion. First, he asserts that Amoco's notices terminating his franchises are procedurally inadequate and legally deficient under the PMPA in that Amoco relied on an incident of alleged fraud regarding rental rebates earlier in 1989 that was not set forth in the reasons for termination in its required notices. Second, he argues that Amoco's termination of his franchises is unlawful and invalid under the PMPA because Amoco retaliated against his exercise of rights un-

der the act. Baker refers to the same alleged incident of fraud, and reasons that because he exercised his rights under the PMPA in conjunction with this incident, Amoco retaliated against him.

Amoco responds that its notices of termination comply with the PMPA for four reasons: (a) Amoco terminated Baker's franchises because of alleged MMP reporting fraud in December 1989; (b) but for this alleged MMP reporting fraud, Baker's franchises would not have been terminated; here Amoco asserts that the earlier alleged incident of fraud was not the "operative reason" for Baker's termination; (c) Baker's MMP fraud sufficiently justifies his termination; and (d) the PMPA notice requirements should not be interpreted to shield a dealer from the consequences of his own fraud. Amoco disputes Baker's conclusion that the terminations and nonrenewals were not based on the alleged MMP reporting fraud.

Baker replies that it is legally insufficient that one reason still justifies termination, and contends that Amoco's notices are deficient because of Amoco's stated reliance upon Baker's prior lawsuit. Baker concludes that Amoco's reliance on the rental rebate circumstances despite their absence from the notices renders them ineffective. He characterizes Amoco's terminations and nonrenewals as retaliatory.

## B. *Legal Framework*

The PMPA sets out the grounds for termination of a franchise at 15 U.S.C. § 2802(b)(2), and for nonrenewal of a franchise at 15 U.S.C. § 2802(b)(3). The act provides that any franchisor seeking to terminate or not to renew a franchise must do so by written notice to the dealer in accord with 15 U.S.C. § 2804(c). The notice of termination and nonrenewal must state the reasons for the proposed action. 15 U.S.C. § 2804(c)(3)(A). A franchisor must comply strictly with the PMPA notice requirements. *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1211 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984).

## C. *Analysis*

### 1. Failure to Delineate Reason in Notices

■ Baker argues that Amoco failed to strictly comply with the notice requirements of § 2804(c)(3)(A) because it did not state in its termination and nonrenewal notices one of the reasons it relied upon to terminate and not to renew. M. Drohan, Amoco District Manager, deposed that his decision to send out notices was based on the December 19, 1989 alleged MMP fraud as well as the parties' previous dispute over the rental rebates. Drohan Depo. pp. 81–82.[1] Amoco responds that the alleged MMP reporting fraud was the "operative" reason for termination and nonrenewal, citing the recommendations to Drohan of the territory manager (Feeney Depo. pp. 8–11, 33), and of the field sales manager (Drohan Depo. pp. 74–75). Amoco now states that it "does not rely upon any ground which is not stated in the notice." Defendant's Brief in Opposition p. 8.

■ Although not adopting Amoco's "operative reason" argument, which presupposes acceptance of Drohan's conclusory and self-serving averment after the plaintiff brought his motion, Drohan Aff. ¶ 3, this Court agrees with Amoco's conclusion that as long as it gave notice to Baker of a legitimate ground on which termination or nonrenewal could be predicated, "the fact that nonrenewal suggests other motives or purposes of [Amoco], does not prevent [Amoco] from exercising its rights under the Act." *Gruber v. Mobil Oil Corp.*, 570 F.Supp. 1088, 1096 (E.D.Mich.1983). If Baker's arguments on this issue are construed as asserting that Amoco pretextually terminated or nonrenewed, they fail should Amoco demonstrate a legitimate basis for its actions. *See infra* part V. If Baker's arguments seek to point out a deficiency in the notices because Amoco failed to delineate each of its possible reasons for termination or nonrenewal, Baker has failed to advance case law or a statutory basis for a requirement that a franchisor

---

1. Baker does not claim that Amoco's notices are deficient in any other manner. The notices Amoco sent Baker appear to meet all of the requirements of § 2804. *See* Drohan Aff. ¶ 21.

delineate each and every reason for termination or nonrenewal. Contrary to such a proposition, extant court decisions appear to require only that the franchisor be justified in terminating the franchisee on one of the grounds authorized by the PMPA. *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1120 (7th Cir.1990); *Shell Oil Co. v. Swerdloff*, ¶ 8259 CCH Bus. Franch. Guide 14,853, 14,855–56 (S.D.N.Y.1984).

Baker's reasoning on this point suffers from the logical fallacy of "illicit process of the major term." In this fallacy, a term is applied to all members of a class in the conclusion even though it could be limited to some members of the class in the premise. The major premise—that the petroleum company must delineate reasons for termination or nonrenewal—tells us what Amoco must do pursuant to § 2804(c)(3)(A). Baker's argument goes further, however. He reasons that because not all of those reasons were stated in the notices, they were defective. Such a conclusion assumes that all such reasons must be related, a distribution of the delineation requirement not found in the major premise.

### 2. Termination or Nonrenewal is Retaliatory

■ Baker avers that the only reasonable conclusion to reach from the factual record thus far adduced is that Amoco terminated or failed to renew his franchises in retaliation for Baker's previous lawsuit regarding the alleged incident of rental rebate fraud. As evidence in support of this retaliation theory, Baker points to: (a) the Drohan Deposition at pages 84–85, in which the Amoco District Manager admitted that one reason leading to termination was the parties' earlier dispute regarding the rental rebates; and (b) in § 3.1 of the Settlement Agreement the parties stipulated that the resolution of the suit resulted in no admission of liability. Baker asserts that he should not be retaliated against for exercising his rights under the PMPA.

Amoco denies any retaliatory motive. It states that it sent out the notices of termination and nonrenewal because Baker allegedly fraudulently reported his MMP pump readings. Because fraud is an authorized ground for termination under § 2802(c)(1), failure to pay in a timely manner when due all sums to which Amoco is legally entitled is an authorized ground for termination under § 2802(c)(8), and breach of reasonable and material provisions of the agreements with Amoco justify termination under § 2802(b)(2)(A), Amoco argues that should its allegation of MMP reporting fraud stand up, it is an alternative reasonable, nonretaliatory basis for the terminations and nonrenewals.

■ In evaluating this summary judgment motion, the Court must view the evidence and all inferences drawn therefrom in the light most favorable to the nonmovant, Amoco. Only if the evidence as a whole could not lead a rational jury to find for Amoco should the Court grant Baker's motion. Reasonable interpretations of the facts at bar can lead to the conclusion that Amoco issued the notices not to retaliate against Baker for the previous lawsuit regarding the rental rebates, but because of the alleged MMP reporting fraud. Although not reaching a conclusion at this stage on Amoco's arguments regarding the alleged MMP reporting fraud,[2] the Court determines that Amoco has proffered sufficient evidence of an alternative reasonable explanation for its actions. That Amoco waived its right to terminate Baker for any actions surrounding the earlier lawsuit[3] does not prohibit Amoco from exercising its rights under the PMPA with respect to new actions. Amoco has presented sufficient evidence to raise a genuine issue of material fact regarding Baker's MMP reporting practices. *See* Feeney Affidavit; Atkinson Affidavit; Amoco's Summary Judgment Brief pp. 11–29. The factual record viewed in a light most favorable to Amoco provides a reasonable interpretation for Amoco's notices of termination and nonrenewal. It furnishes the plausible alternative explanation that Amoco did not

---

**2.** *See infra* part V.C.

**3.** Pursuant to 15 U.S.C. § 2802(b)(2)(A)(i), a franchisor can rely as a basis for termination only upon violations of its agreement occurring within 120 days of the date of its notice.

retaliate against Baker for his previous lawsuit or for exercising his rights under the PMPA, but instead acted within the scope of the PMPA, specifically §§ 2802(b) & (c), to terminate and not to renew Baker's franchises. Accordingly, because a rational jury could find for Amoco, Baker's summary judgment motion will be denied.

## V. DEFENDANT'S SUMMARY JUDGMENT MOTION

### A. *Legal Framework*

Title 15 U.S.C. § 2802(b)(2) provides:

The following are grounds for termination of a franchise or nonrenewal of a franchise relationship:

(A) A failure by the franchisee to comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship.

. . . . .

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable....

The United States Court of Appeals for the Seventh Circuit in *Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1217 (7th Cir.1984), related the standard of review in determining whether the ground relied on for termination is proper under § 2802(b)(2)(C):

[W]e must look to the purposes of the PMPA. *Brach v. Amoco Oil Co.*, 677 F.2d 1213 (7th Cir.1982). In *Brach*, this court found that Congress, in enacting the PMPA, sought to protect franchisees from arbitrary terminations and nonrenewals while allowing franchisors to exercise reasonable business judgment. Section 2802(b)(2)(C) helps maintain that balance by allowing termination for unforeseen yet reasonable grounds. *Id.* at 1230 [sic; 1220]. This court held that the section must be given a narrow construction "consistent with its overriding purpose to protect franchisees." *Id.* at 1221. "Events in the nature of contract violations must be assessed by an independent analysis of reasonableness and materiality." *Id.* This test is equivalent to the statutory requirement that termi-

nation cannot be for a failure that is for technical or unimportant reasons or for reasons beyond the franchisee's control. As the Court also noted in *Moody*, § 2802(c) provides examples of relevant events for which termination is reasonable. 734 F.2d at 1217. They include "fraud or criminal misconduct by the franchisee relevant to the operation of the marketing premises" (§ 2802(c)(1)), and "failure by the franchisee to pay to the franchisor in a timely manner when due all sums to which the franchisor is legally entitled" (§ 2802(c)(8)). Congress did not intend the list at § 2802(c) to be exclusive; other events may serve as grounds for termination. 734 F.2d at 1217 (citing 1978 U.S. Code Cong. & Admin.News 873, 893, 896). "Courts must carefully scrutinize grounds that are not listed to make certain that the statutory standard of relevance and reasonableness has been met." *Moody*, 734 F.2d at 1217. *See also Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1573 (11th Cir. 1987).

### B. *Analysis*

#### 1. § 2802(b)(2)(C)

Congress has determined that fraud or failure to pay are *per se* reasonable grounds for termination under § 2802(b)(2)(C), and are delineated as such at § 2802(c)(1) & (8). *Moody*, 734 F.2d at 1217.

##### a. *Fraud*

The elements of fraud in Wisconsin are a false representation made with an intent to defraud and reliance by the injured party on the misrepresentation. *Ritchie v. Clappier*, 109 Wis.2d 399, 404, 326 N.W.2d 131 (Ct.App.1982).

Amoco asserts that Baker defrauded it by manipulating the meter readings on his MMP reports. Amoco contends that Baker intentionally misrepresented meter readings on the December 19, 1989 MMP price change report, and intentionally misrepresented meter readings provided to territory manager Feeney in a December 21, 1989 audit.

Baker and his wife Diane admit that five readings on the December 19th price report

were inaccurate in that they overstated the number of gallons actually sold before the December 19th price increase.[4] D. Baker Depo. p. 8. Mrs. Baker did not indicate that the readings were estimates. *Id.* at pp. 38–39. Amoco does not allow estimated meter readings in any circumstances. Mrs. Baker did not attempt to file an amended report with the correct meter readings. Baker became aware that his wife had submitted inaccurate meter readings no later than December 20th. T. Baker Depo. pp. 53–54. Baker also did not alert Amoco of the errors in the meter readings.

Feeney read Baker's pump meters at the 35th Street station on December 21st, and wrote the readings on his audit report. To compute the difference between the meter readings of December 19th and December 21st, Feeney asked to see Baker's station copy of the December 19th MMP report. Baker did not allow Feeney into Baker's office to view the copy, but instead had his wife copy the numbers from the December 19th report onto Feeney's audit report. Mrs. Baker admits that she knowingly copied the numbers inaccurately from the December 19th report onto Feeney's December 21st report, D. Baker Depo. pp. 30, 36–39, and acknowledged at her deposition that had she accurately copied the meter readings from the December 19th MMP report onto the December 21st audit report, the audit would have shown that the 35th Street station sold only two gallons of regular unleaded gasoline in the two days after the price increase. *Id.* at pp. 36–39. Mrs. Baker admits that she changed one digit of the December 19th report for unleaded gasoline such that the number of gallons sold before December 19th was increased by 1,000 gallons.

Amoco also argues that Baker committed "back reading" with regard to price decreases and "delayed reading" with regard to price increases. Baker and his employees admit knowing that wholesale price changes take effect at 12:01 a.m. Mesich Depo. pp. 31–35, 39. Even though Baker's MMP price change reports state 12:01 a.m. as the time of the report, Ex. 8–C & 8–D,

the actual meter readings are often delayed as much as 24 hours. Mesich Depo. pp. 46–50. Amoco also submits graphic evaluation of Baker's alleged MMP manipulation through the analyses of Feeney and Atkinson. *See* Atkinson Aff. Ex. 10A; Feeney Aff. Ex. A–L.

Baker acknowledges that the December 19th report does not accurately relate the amount of gasoline pumped. Baker has designated his wife Diana as the person responsible for completing and filing the MMP reports. T. Baker Aff. ¶ 6. She asserts that the episode was an innocent mistake. D. Baker Aff. ¶ 2. She contends that because she did not have access to the actual physical meter readings of December 19th, she used the meter readings from December 18th and estimated the number of gallons which she reasonably expected would have been pumped on December 19th. *Id.* at ¶¶ 12–13. She advances the explanation that her 4,000 gallon estimate ended up being incorrect due to adverse weather conditions and an unrelated clerical error. *Id.* at ¶ 16. Baker argues that the undisputed evidence, and the disputed evidence examined in a light most favorable to him, demonstrate only that an unintentional error in reporting occurred on both December 19th and December 21st.

Even viewing the record in a light most favorable to Baker and making all reasonable inferences from the objective facts in Baker's favor, the evidence before the Court establishes that the Bakers were "reading ahead" on December 19th. Exhibit 8–C is the December 19, 1989 MMP price change report with an executed time of 12:01 a.m. The readings on that report overstated the amount of gasoline sold by more than 4,000 gallons. Harrington Aff. comparing Ex. 19–A and Ex. 8–C. Mrs. Baker admits knowing that the readings were false when she prepared the report. D. Baker Depo. pp. 30, 36–39. The Bakers admit expecting that Amoco would rely on false readings contained in the December 19th report in computing the amount of money due from Baker to Amoco. D. Bak-

---

**4.** Amoco asserts that the Bakers were thus "reading ahead": by falsely overstating the number of gallons of gasoline sold immediately be-

fore the price increased, Baker paid for fewer gallons at the higher price.

er Depo. p. 8. Examining the evidence through the same lens, the Court reaches the same conclusion regarding the Bakers' actions on December 21st.

Yet this Court cannot conclude from these undisputed facts that Baker committed fraud against Amoco due to the presence of the intent element in the fraud cause of action. Although Amoco has presented strong evidence of such fraud, Baker and his wife have pleaded that the case was a mistake and that they had no intention to defraud Amoco. November 15, 1990 T. Baker Aff. ¶ 5, p. 2; D. Baker ¶ 2–9. Baker strings together a number of strained explanations to combat Amoco's evidence of "reading ahead," "back reading," and "delayed reading": Mrs. Baker estimated the meter readings (although she failed to alert Amoco of this), those estimates were incorrect due to a number of unfortuitous circumstances, the entire incident was unintentional, and the December 21st report was misread. But a state of mind requirement of intent is an element of the fraud claim. Despite the powerful evidence adduced by Amoco, this Court deems it improper when an intent question exists to grant summary judgment on such a claim. Such a question is peculiarly for a jury, rather than a court. *Torraco v. Maloney,* 923 F.2d 231, 234 (1st Cir.1991). As the Eleventh Circuit Court of Appeals pointed out in *United States v. Davis,* 809 F.2d 1509 (11th Cir.1987), unless the Court can say that a party's case is so fantastic, speculative, or inconsistent that it falls of its own weight, it is the function of the jury to observe *demeanor and listen to testimony* in order to determine the credibility of witnesses. Therefore, a court should be unwilling to preclude an explanation from the one person who can best describe the plaintiff's state of mind. *Id.* at 1512–13. Thus, the Court will not conclude at this stage that Baker defrauded Amoco, and consequently that Amoco's notices of termination and nonrenewal are justified.

### b. *Failure to Pay*

 Section 2802(c)(8) proscribes a failure by the franchisee to pay the franchisor in a timely manner when due all sums to which the franchisor is legally entitled. The Seventh Circuit Court of Appeals has stated regarding this subsection: "That provision, however, is more intended to cover the potential problem of repeated lateness or arrearage in rent or motor fuel payments...." *Brach,* 677 F.2d at 1221 (citing *inter alia* 1978 U.S.Code Cong. & Admin.News at 896). The Seventh Circuit concluded that:

> nonrenewal for untimely payments is said to be subject to 'prevailing commercial or industrial trade practices', which further suggests that events in the nature of contract violations must be assessed by an independent analysis of reasonableness and materiality. In a definitional section, the Act also limits the availability of these grounds by providing that " 'failure' does not include ... any failure for a cause beyond the reasonable control of the franchisee." 15 U.S.C. § 2801(13)(B).

677 F.2d at 1221 (citation and footnote omitted).

Considering the strictures that the Seventh Circuit has placed upon the use of this second enumerated ground for termination or nonrenewal under § 2802(c) as applied through § 2802(b)(2)(C), including the admonition that this section be given a narrow construction "consistent with its overriding purpose to protect franchisees," *Brach,* 677 F.2d at 1221, Amoco's arguments must also fail on this point. Rather than repeated lateness or arrearage in motor fuel payment (although arrearage is certainly a consequential issue), this action revolves around alleged fraud and misrepresentation in such payment. Whether the cause of the failure was beyond Baker's reasonable control is the very question before the Court; it should thus not be begged by an automatic application of § 2802(c)(8). An analysis under this subsection must take on the contour of its companion subsections, see *Brach,* 677 F.2d at 1221. The sticking point of Baker's intent thus precludes Amoco's summary judgment motion on this ground.[5] Conse-

---

5. In reaching this conclusion, the Court in no way adopts Baker's arguments regarding the requisite time for payment at pages 19–20 of his response brief.

quently, despite strong evidence to the contrary, the Court concludes that at least one genuine issue of material fact exists precluding a grant to Amoco of summary judgment pursuant to § 2802(b)(2)(C).

2. § 2802(b)(2)(A)

■ The Seventh Circuit in *Brach* instructed that "[e]vents in the nature of contract violations must be assessed by an independent analysis of reasonableness and materiality." 677 F.2d at 1221. A provision is reasonable if it "has a basis in common sense and experience and is not unconscionable." *Moody*, 734 F.2d at 1217. A provision is material if the parties included it in the franchise agreement "in good faith" and "in the normal course of business." *Brach*, 677 F.2d at 1222. The Seventh Circuit in *Brach* adopted the touchstone that materiality "is applied as an objective test of the significance of a fact to the transactions under consideration." *Id.* (citing *Castaneda–Gonzalez v. I.N.S.*, 564 F.2d 417, 431 (D.C.Cir.1977)). The PMPA is designed to protect a franchisee from arbitrary or discriminatory actions of franchisors by prohibiting any termination under § 2802(b)(2)(A) for a franchisee's failure to comply with what was "only technical or unimportant to the franchise relationship." § 2801(13)(A). Yet the PMPA also protects "the legitimate needs of a franchisor to be able to terminate a franchise or not renew a franchise relationship based upon certain actions of the franchisee, including failure to comply with contractual obligations." *Matter of Joyner*, 46 B.R. 130, 133 (Bankr.M.D.Ga.1985).

Paragraph 15(d) of the leases Baker had with Amoco proscribes "[c]ommission by Lessee or any of Lessee's employees or agents of any deceptive, ... or other improper act relevant to the operation of the business on the premises which is detrimental to Lessor ... including without limitation ... misrepresentation in pump meter readings and/or reporting thereof, ..." Paragraph 16(d) of those same leases places on the Lessee an affirmative duty to take action to avoid the event which justi-

fies the Lessor's exercise of a right of termination or nonrenewal.[6] Baker's franchise agreements require him to pay Amoco the wholesale price for gasoline in effect at the time the gasoline passes through the pump meters. Dealer Supply Agreement ¶ 4; MMP Agreement ¶¶ 4–5.

These lease and franchise agreement sections are reasonable and material provisions of the franchise relationship. They are reasonable because the MMP reporting requirements have a solid basis in common sense and experience: a franchisor can insist on reporting requirements from franchisees on a matter such as the number of gallons of gasoline sold at a wholesale price during the course of a consignment relationship regarding that product. They are material because they were included in the normal course of business—they are standard provisions included in all Amoco leases, dealer supply agreements, and MMP agreements (Drohan Aff. ¶ 22)—and because they pass the objective test of concerning a significant fact to the transactions under consideration—the accurate recording and reporting of meter readings is a necessity to the MMP agreement, which together with the lease and the dealer supply agreement constitutes a franchise. These provisions are not ambiguous or unclear, nor are they "technical or unimportant to the franchise relationship," as warned against in § 2801(13)(A). Indeed, they implicate the core of the franchisor-franchisee relationship: absent compliance with the MMP reporting system, the consignment basis under which gasoline is sold by the franchisor through the franchisee is undermined. Congress expressly noted that "[s]ome contractual violations ... may be so serious as to undermine the entire relationship." 1978 U.S.Code Cong. & Admin.News at 876. The Court deems failure to accurately report under the MMP system to be such a violation, and not to be beyond the franchisee's control.

It is at this point that Amoco's evidence catches up with Baker. Baker has admitted misrepresenting pump meter readings to Amoco on December 19th and 21st.[7]

---

**6.** For the text of these lease provisions, *see supra* pp. 1387–88.

**7.** *See supra* pp. 1393–94.

Baker has thus breached the terms of the franchise agreement by engaging in "misrepresentation of pump meter readings and/or reporting thereof." ¶ 15(d). Also, it follows from the strong evidence of reporting delayed readings when the price increased and reporting the previous day's meter readings when the price decreased that Baker did not pay Amoco the full price for the gasoline purchased, a violation of ¶ 15(e) of the leases Baker had with Amoco. Unlike this Court's previous analyses, however, the intent state of mind requirement is not an element in this evaluation. The objective facts, even viewed in a light most favorable to Baker, lead to the conclusion that a reasonable jury could not find that he did not misrepresent the pump meter readings or fail to pay Amoco the full price for the gasoline purchased under the letter of these provisions. The evidence leading to this conclusion is overwhelming:

(a) the factual support for the determination that Baker was "reading ahead" on December 19, 1989 is related above, *see supra* p. 5, and at p. 1 of Amoco's Reply Brief; the Bakers offer weak excuses for these actions, none of which vitiate the conclusion that the letter of the relevant provisions has been breached;

(b) the factual support for the determination that Baker misrepresented pump meter readings on December 21, 1989 is related above, *see supra* p. 6, and at pp. 16–18 of Amoco's Principal Brief; the Bakers' excuses for this conduct suffer the same fate as those regarding the December 19th circumstances; and

(c) Baker has admitted his use of back meter reading and reading ahead on his MMP price change reports for years; just because Amoco never terminated Baker before for such conduct does not justify it; in fact, Amoco made Baker aware that such actions would not be tolerated on previous occasions, see Amoco Reply Brief pp. 12–13; further, Baker's citation to other dealers and the alleged "24 hour grace period" for reporting does not lead to the conclusion that Baker's conduct is correct just because others also engage in it in light of the Amoco employee testimony that no such grace period exists (Drohan Depo. p. 99; Feeney Depo pp. 82, 113; Atkinson Depo. p. 93; Dumas Depo. pp. 71, 75).

Evaluating the pleadings and the record evidence, this Court concludes that no genuine issue of material fact exists with regard to Baker's misrepresentation of meter readings to Amoco, his breach of the dealer supply agreement and the MMP agreement through these actions, his failure to pay all sums to which Amoco is entitled, and his failure to provide Amoco with accurate meter readings as is required by ¶ 16(d) of the lease agreements. After an independent analysis, the Court has found ¶¶ 15 & 16 of the lease agreements, ¶ 4 of the dealer supply agreement, and ¶¶ 4 & 5 of the MMP agreement to be reasonable and material contractual provisions. No genuine issue of material fact exists regarding Baker's breach thereof. Baker's breach consequently justified Amoco's termination and nonrenewal of its franchise agreements with Amoco under 15 U.S.C. § 2802(b)(2)(A).

Amoco met its initial burden by demonstrating with affidavits the absence of genuine issues of material fact on these matters. Baker had to produce proper documentary evidence to support his contentions. Baker's sole evidence in support of his claims were the averments of him and his wife that although the misrepresentations occurred, they were unintentional and constituted incidental mistakes. But an intent requirement is not included in the leases, dealer supply agreements, and MMP agreements that make up the franchise relationship between Baker and Amoco. Accordingly, pursuant to § 2802(b)(2)(A), the Court finds Amoco justified in terminating and not renewing its franchise agreements with Baker because Baker violated the letter of those agreements. Consequently, Amoco's summary judgment motion will be granted.

### 3. Retaliation Claim

■ Baker's retaliation allegations do not state a claim for affirmative relief. Instead, they constitute a defense to Amoco's evidence of misrepresentation. The factual basis for this defense was ground

into this Court's summary judgment determinations. Accordingly, the Court will grant Amoco's summary judgment motion to dismiss Baker's fifth and sixth causes of action.

#### 4. WFDL Claim

 Although Baker's seventh cause of action is a Wisconsin Fair Dealership Law claim pursuant to Wis.Stat. § 135.01 *et seq.*, as this Court noted at 751 F.Supp. 1357, 1359 n. 2 (E.D.Wis.1990), the PMPA preempts the WFDL in petroleum franchise cases. Accordingly, Amoco's summary judgment motion on Baker's WFDL claim will be granted.

### VI. SUMMARY

Under the foregoing reasoning, the Court DENIES the plaintiff's summary judgment motion and GRANTS the defendant's summary judgment motion. The Clerk of Court shall enter judgment in accordance with the conclusions of this *Decision and Order.*

SO ORDERED.