**PDV MIDWEST REFINING LLC, et. al., Plaintiffs/Counter–Defendants,**

v.

**ARMADA OIL & GAS COMPANY, INC., et. al., Defendants/Counter–Plaintiffs.**

No. 97–CV–72287–DT.

United States District Court, E.D. Michigan, Southern Division.

Oct. 3, 2000.

Faith E. Gay, Sidney & Austin, New York City, Dane A. Lupo, Lupo & Koczkur, P.C., Detroit, MI, for plaintiffs.

Jamal John Hamood, Hamood & Fergestrom, Troy, MI, for defendants.

### MEMORANDUM OPINION AND ORDER CONTAINING THE COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

WOODS, District Judge.

This matter came before the Court for a bench trial, commencing on June 23, 2000, and concluding on July 10, 2000. Upon

completion of the seven-day trial, the Court hereby enters the following Findings of Fact and Conclusions of Law pursuant to Fed.R.Civ.P. 52(a).

## I. INTRODUCTION

The Court has considered the Amended Joint Final Pretrial Order, the opening statements of counsel, the parties' proposed Findings of Fact and Conclusions of Law ·submitted at the close of trial, the testimony of witnesses at trial, documents and photos admitted as exhibits at trial, as well as deposition excerpts designated by the parties at trial. The Court has considered what inferences can reasonably be drawn from the direct and circumstantial evidence, and has considered the demeanor and manner of the witnesses who testified at trial in assessing the credibility of and weight to be accorded to the testimony of those witnesses. This opinion contains the Court's Findings of Fact and Conclusions of Law, in accordance with Rule 52(a).

## II. BACKGROUND

The following background was derived primarily from the parties' stipulated facts set forth in their Amended Joint Final Pretrial Order. Plaintiffs/Counter–Defendants are PDV Midwest Refining LLC ("PDV–MR") and CITGO Petroleum Corporation ("CITGO"). PDV–MR is a Delaware corporation having its principal place of business in Tulsa, Oklahoma. CITGO is a Delaware corporation having its principal place of business in Tulsa, Oklahoma.

Defendants/Counter–Plaintiffs are Armada Oil and Gas Company, Inc. ("Armada"), Allie Berry ("Berry"), Ali K. Jawad ("Jawad") and Sam Haddas ("Haddas"). Armada is a Michigan corporation having its principal place of business in Dearborn, Michigan. Berry, Jawad and· Haddas are Michigan citizens. Jawad is Armada's president. Berry has been Armada's vice-president since 1986. Haddas is Jawad's father-in-law.

Third–Party Defendants are Knight Enterprises, Inc. ("Knight"), UNO–VEN Company ("UNO–VEN") and Union Oil Company of California (hereinafter "Unocal"). UNO–VEN was formed as an Illinois partnership in 1982.

On May 14, 1997, Plaintiffs PDV–MR and CITGO filed an eight-count verified complaint alleging that Defendants Armada, Berry, Jawad and Haddas obtained petroleum products through fraudulent means and failed to pay for over $3 million worth of petroleum products. Subsequently, on July 3, 1997, Defendants filed a counterclaim and third-party complaint alleging that both Plaintiffs and Third–Party Defendants UNO–VEN and Unocal violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2841, and Plaintiff CITGO and Third–Party Defendant Knight interfered with Defendants' business expectations and relationships. All Third–Party Defendants were dismissed from this action prior to trial.[1]

By Order dated October 1, 1999, this Court granted partial summary judgment in favor of Plaintiffs on their contract claim, holding that Defendants were contractually liable for petroleum products they took without payment. The Court found that an issue of fact remained with respect to a portion of the amount to which Plaintiffs claimed entitlement. The remainder of Plaintiffs' claim against Defendants was resolved prior to trial. *See* Settlement dated June 16, 2000. The only claims remaining at trial were Defendants'/Counter–Plaintiffs' claims under the PMPA.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 to resolve Defendants'/Counter–Plaintiffs' claims under the PMPA. Defendants maintain that Plaintiffs failed to comply with

---

**1.** By Order dated February 10, 1999, Third–Party Defendant Knight was dismissed from this action. The remaining Third–Party Defendants, UNO–VEN and Unocal, were dismissed on August 30, 1999. PDV–MR and

CITGO have assumed liability for any compliance requirements or obligations under the PMPA on the part of Unocal or UNO–VEN. *See* Stipulated Fact 42.

the PMPA when Plaintiffs terminated Defendants' franchise. Plaintiffs assert that termination is proper due to the restructure of the UNO–VEN partnership and the loss of the use of the Union 76 trademarks. Defendants counter that Plaintiffs' two bases for termination should be construed as one. Defendants alternatively argue that the reasons provided by Plaintiffs masked the true basis of the termination—withdrawal from the geographic market—and Plaintiffs did not comply with the PMPA's requirements for withdrawal from the market. Defendants further contend that Plaintiffs did not meet the PMPA notice requirements.

## III. FINDINGS OF FACT

### A. The Parties

1. In 1989, UNO–VEN was formed as an Illinois partnership between subsidiaries of two oil companies: Unocal and Petroleos de Venezuela, S.A. ("PDV").[2] Prior to May 1, 1997, UNO–VEN was owned equally by partners PDV–MR and Unocal. *See* Plfs.' Ex. 1, Partnership Agreement; 6/23/00 Jerald Thompson testimony at 34–36; Stipulated Fact 3.[3]

2. Unocal owned the Union 76 trademarks. Unocal brought marketing and refining assets to the UNO–VEN partnership and granted UNO–VEN a license to sell petroleum products in a specified 15-state area under the Union 76 trademarks. PDV brought a crude oil supply agreement ("CSA") to the UNO–VEN partnership.

2. As represented by Plaintiffs throughout the proceedings in this case, all of the PDV entities discussed in this Order are subsidiaries or affiliates of Petroleos de Venezuela, S.A.

3. Jerald Thompson is President of PDV–MR and Senior Vice–President in charge of information, technology, field and regulatory compliance, government and public affairs of CITGO. *See* 6/23/00 Thompson testimony at 33–34.

4. The term "distributor" in the context of the petroleum industry is interchangeable with the terms "marketer" and "jobber."

5. Brian Conners was employed at Unocal for the relevant period, and was one of the three

*See* Plfs.' Ex. 1, Partnership Agreement; Plfs.' Ex. 2, Trademark License Agreement; 6/23/00 Jerald Thompson testimony at 34–36.

3. Armada is a distributor of petroleum products whose principal business is to purchase gasoline and other motor fuels from oil companies or "refiners" and distribute it to independent retail gasoline stations for sale under the oil company or refiner's trademark or "brand," pursuant to a contractual arrangement with the oil company or refiner. *See* Plfs.' Ex. 3; 6/29/00 Allie Berry testimony at 211–14.[4]

4. CITGO's business includes the operation of the Lemont refinery and distribution/sale of gasoline to marketers. *See* 6/23/00 Thompson testimony at 53.

5. PDV–MR owns the Lemont refinery. PDV–MR's business includes the refining and sale of gasoline for sale under trademark, including the CITGO trademark. *See* 6/23/00 Thompson testimony at 34, 52–53.

6. Both CITGO and PDV–MR are subsidiaries of Petroleos de Venezuela, S.A. *See* Plfs.' Ex. 5; 6/23/00 Thompson testimony at 53.

7. On March 31, 1997, Unocal sold the Union 76 trademarks along with all of Unocal's West Coast refining and marketing assets to Tosco Corporation ("Tosco"). *See* 6/23/00 Brian Conners testimony at 191–93;[5] 6/23/00 Stephen J. Bednar testimony at 86;[6] 6/23/00 Thompson testimony at 64–65.[7]

Unocal representatives on UNO–VEN's executive committee. *See* 6/23/00 Conners testimony at 188.

6. Stephen Bednar is senior corporate counsel for CITGO. *See* 6/23/00 Bednar testimony at 75.

7. This finding is further buttressed by *Unified Dealer Group v. Tosco Corp.*, 16 F.Supp.2d 1137 (N.D.Cal.1998), wherein the court stated: "On March 31, 1997, Tosco purchased from the Union Oil Company of California ("Union") the 76 Products Company, which included approximately 900 service stations in California. Tosco also acquired the exclusive right to use the 'Union 76' and '76' trade-

## B. The Franchise Relationship

1. Armada was a distributor and a franchisee as defined by the PMPA during the relevant period. *See* 15 U.S.C. § 2801(4). PDV–MR, CITGO, and UNO–VEN, were franchisors during the relevant period. *See* § 2801(3).

2. In 1990, Armada and UNO–VEN entered a Marketer Sales Agreement under which Armada became a distributor of UNO–VEN gasoline to be sold by retail gasoline stations under the "Union 76" brand. *See* Plfs.' Ex. 29–30, 1990 Marketer Sales Agreement; 6/29/00 Berry testimony at 211–12, 214–16.

3. In 1994, Armada acquired a jobbership under a second brand: British Petroleum ("BP"). BP and Armada agreed to a ten-year contract. *See* Plfs.' Ex. 226, 1994 Branded Jobber Agreement; 6/30/00 Berry testimony at 21.

4. On January 1, 1995, Armada and UNO–VEN entered into a second Marketer Sales Agreement ("Agreement") whereby UNO–VEN agreed to supply petroleum product to Armada and Armada agreed to pay UNO–VEN for such product. *See* Stipulated Facts 10 and 12; Plfs.' Ex. 3., 1995 Marketer Sales Agreement; 6/29/00 Berry testimony at 215–16.

5. The duration of the Agreement was three years. The Agreement provided that a month-to-month renewal would continue upon termination of the three-year period until either: (a) a new agreement was executed, (b) Armada terminated on 90 days' written notice, or (c) UNO–VEN provided notice in accordance with the PMPA. The Agreement stated that UNO–VEN could terminate or non-renew the Agreement for any of the reasons or causes permitted by the PMPA. *See* Stipulated Fact 11; Plfs.' Ex. 3.

6. The Agreement specified that Unocal granted a license to UNO–VEN to use the Union 76 trademark. *See* Plfs.' Ex. 3.

7. The Agreement further provided that UNO–VEN's rights and responsibilities were assignable. *See* Plfs.' Ex. 3.

## C. PDV Purchases Unocal's Interest in UNO–VEN Partnership

1. In the early 1990s, PDV engaged in negotiations to buy out Unocal, its partner in UNO–VEN. *See* 6/23/00 Thompson testimony at 38–39. The partnership became an economic drain on PDV because the CSA contained a fixed margin provision that forced PDV to supply UNO–VEN with crude oil at a price substantially below prevailing market prices. *See id.* at 35, 37–38; 6/23/00 Marty Sedlacek testimony at 177–78. Negotiations did not advance because the partners were unable to agree on price terms for the buy-out. *See* 6/23/00 Thompson testimony at 38–39, 71.[8]

2. In late 1996, early 1997, Unocal determined that it wanted to focus entirely on the upstream oil industry—exploration and extraction of oil—rather than downstream—refining and marketing product—culminating in the December 26, 1996 Letter of Intent and the ultimate May 1, 1997 closing under the Partnership Interest Retirement Agreement. *See* 6/23/00 Conners testimony at 189–90, 203–04.

3. On December 26, 1996, PDV and Unocal entered into a non-binding Letter of Intent ("LOI") concerning the negotiations for PDV's purchase of Unocal's 50% interest in UNO–VEN. The LOI stated that it was: "not intended to represent or constitute a binding agreement between, or commitment on the part of PDV and UNOCAL with respect to the matters ad-

---

marks in perpetuity." *Id.* at 1139. In light of Thompson's, Bednar's and Conners' consistent testimony concerning the timing of the Tosco/Unocal transaction, as well as the published opinion set forth above, this Court finds that no significance attaches to Marty Sedlacek's unclear testimony regarding the date of the sale. *See* 6/23/00 Marty Sedlacek at 167–172.

**8.** PDV and Unocal never reached an agreement as to the terms and conditions of a buyout prior to the 1997 agreement because Unocal's asking price for its 50% share in UNO–VEN was too high. *See* 6/23/00 Thompson testimony at 71.

dressed." Plfs.' Ex. 5; 6/23/00 Thompson testimony at 38–41.

4. UNO–VEN's distributors, including Armada, received periodic updates concerning the progress of the negotiations set forth in the LOI. *See* 6/23/00 Thompson testimony at 44; Plfs.' Exs. 8–9;[9] Plfs.' Exs. 15–17. Armada acknowledges that it received these letters. *See, e.g.,* Stipulated Facts 15 and 16; 6/30/00 Berry testimony at 26–28, 30–31.

5. At PDV's direction, CITGO began to conduct a due diligence on the proposal set forth in the LOI. *See* Plfs.' Ex. 6, January 6, 1997 Confidentiality Agreement; 6/23/00 Thompson testimony at 42–43.

6. UNO–VEN, CITGO and PDV (America) entered into a January 6, 1997 Confidentiality Agreement setting forth terms of the due diligence inquiry. Under the Confidentiality Agreement, CITGO:

> agree[d] that it will use Confidential Information for the purpose of evaluating, negotiating, planning and preparing for implementation, and implementing the Transaction and that, as except as contemplated herein, it will not use any Confidential Information in connection with any sales activities (including pricing, costs and margins) or any other business operations that may be in competition with UNO–VEN's business.

Plfs.' Ex. 6.

7. In March 1997, the negotiations between PDV and Unocal were suspended, primarily because of environmental issues that arose during the due diligence review. *See* 6/23/00 Thompson testimony at 44–46. The parties entered a "cooling-off" period for approximately 3–4 weeks. *See id.* at 45.

8. As set forth above, *see* Findings of Fact at A(7), on March 31, 1997, Unocal sold the Union 76 trademark and all of its West Coast refining and marketing assets to Tosco. *See* 6/23/00 Conners testimony at 191–93.

9. On April 11, 1997, PDV and Unocal reached an agreement and signed a Partnership Interest Retirement Agreement ("PIRA"), which outlined the UNO–VEN restructuring. The PIRA provided that the two UNO–VEN partners agreed that PDV would purchase all available motor fuel refining and marketing assets from UNO–VEN, thus expanding PDV's 50% interest in UNO–VEN's assets to 100%. *See* Stipulated Fact 13; Plfs.' Ex. 14, April 11, 1997 PIRA.

10. The PIRA authorized PDV to designate a party to operate UNO–VEN's assets and administer UNO–VEN's Marketers Sales Agreements with its Union 76 distributors. PDV's designee was CITGO. *See* Stipulated Fact 13; Plfs.' Ex. 14.

11. The PIRA required that the parties execute an amendment to the Trademark Licensing Agreement agreeing to terminate the Agreement prior to closing. *See* Plfs.' Ex. 14 at § 5.07; Plfs.' Ex. 23, Trademark License Agreement Amendment And Termination Agreement.

12. Under the PIRA, Unocal agreed that PDV could continue to use the Union 76 trademarks and credit card for all UNO–VEN distributors for one year after closing. *See* Plfs.' Ex. 14. *Accord,* Plfs.' Ex. 23 at ¶ 14, amending § 8.01 of the License Agreement; Stipulated Fact 14.

13. The Trademark License Agreement in effect prior to this amendment provided, in part, that the license remained in effect perpetually unless it was terminated "by written mutual consent of the parties at any time." Plfs.' Ex. 2 at § 8.01(i).[10]

14. The parties executed a mutual written amendment consenting to the termination of the License Agreement. *See* Plfs.' Ex. 23.

---

**9.** Exhibit 8 is Armada's counsel's February 6, 1997 letter inquiring about the LOI and its implications for Armada. Exhibit 9 is CITGO's February 13, 1997 response.

**10.** Although other bases existed to terminate the License Agreement, none of them are relevant to this case.

15. The Trademark License Agreement Amendment And Termination Agreement, dated April 30, 1997, was executed by UNO–VEN, Unocal, PDV–MR, and CITGO. *See* Plfs.' Ex. 23.

16. On May 1, 1997, the UNO–VEN restructuring closed, with approval of Unocal's and PDV's boards of directors. *See* 6/23/00 Thompson testimony at 48–49; Plfs.' Exs. 19–21. As a result, PDV paid Unocal $250 million to become the sole owner of UNO–VEN's refining and marketing assets. *See* 6/23/00 Thompson testimony at 48–49; 6/23/00 Conners testimony at 191–193.

17. As of May 1, 1997, CITGO operated UNO–VEN's assets, including the Lemont, Illinois refinery, to provide Union 76 branded product to UNO–VEN distributors, such as Armada, through May 1, 1998. *See* Stipulated Facts 27 and 28; 6/23/00 Thompson testimony at 52–53.

**D. Correspondence Concerning UNO–VEN Restructure**

1. As set forth above, UNO–VEN's distributors, including Armada, received periodic updates concerning the progress of the negotiations set forth in the LOI. *See, e.g.,* Stipulated Facts 15 and 16; 6/23/00 Thompson testimony at 44; 6/30/00 Berry testimony at 26–28, 30–31; Plfs.' Exs. 8–9 and 15–17.

2. CITGO sent Armada a letter dated April 18, 1997, informing Armada of the April 11, 1997 PIRA. *See* Plfs.' Ex. 15; Stipulated Fact 15.

3. CITGO's letter indicated that as of May 1, 1997, "UNO–VEN's refining and marketing assets will be transferred to an indirect subsidiary of Petroleos de Venezuela, S.A. [Plaintiff PDV]." Plfs.' Ex. 15.

4. The April 18 letter also states: ... there will be a twelve (12) month transition period in which CITGO has agreed to supply [Union 76] branded petroleum products to [Armada]. During this transition period, [Armada] will be able to continue to use the [Union 76] Marks, and accept the Union 76 credit card. During this transition period, [Armada's] UNO–VEN agreements will continue in place and be administered by CITGO.

Plfs.' Ex. 15; Stipulated Fact 15.

5. In CITGO's subsequent April 21, 1997 letter to Armada, CITGO requested Armada to complete CITGO's Electronic Funds Transfer Agreement ("EFT") in order to "facilitate an uninterrupted supply on the closing date [of the UNO–VEN/PDV–MR Contract] and assure the accurate and timely processing of CITGO's EFT." Plfs.' Ex. 17; Stipulated Fact 16.

6. The EFT authorized CITGO and/or its affiliates "to initiate electronic entries to [Armada's] bank account ... and further directs [the bank] to accept and debit/credit the amount of such entries to [Armada's] Account." Plfs.' Ex. 18; Stipulated Fact 17.

7. UNO–VEN's April 21, 1997 letter to Armada referenced the expected May 1, 1997 closing date between Unocal and PDV–MR and encouraged a prompt return of CITGO's EFT application. The letter indicated that during the twelve-month transition period after the closing: "you will continue to receive Unocal branded petroleum products and be able to use the [Union] 76 Marks. The products will be supplied to you by CITGO Petroleum Corporation, which will become the operator of the UNO–VEN refinery, terminals and lubricant facilities as of the closing." Plfs.' Ex. 16.

8. Armada returned an executed EFT to CITGO on April 25, 1997. Berry signed the EFT on behalf of Armada. *See* Stipulated Fact 17; Plfs.' Ex. 18.

9. CITGO processed Armada's EFT on April 29, 1997. *See* Stipulated Fact 18.

10. UNO–VEN sent an April 30, 1997 letter ("Notice of Termination" or "Notice") to Armada, addressed to Berry, reiterating the facts supplied in CITGO's April 18th letter. *See* Stipulated Facts 19 and 25. This letter served as notification of termination under the PMPA. *See* Stipulated Facts 19–25. The Notice provided, in relevant part:

On April 11, 1997, the owners of The UNOVEN Company ("UNOVEN") entered into a definitive agreement for the distribution of the refining and marketing assets of the company to an indirect wholly-owned subsidiary of Petroleos de Venezuela, S.A.; which will become the owner of those assets. The transaction is scheduled to close on May 1, 1997. Because Unocal will no longer have an interest in the refining and marketing assets, UNOVEN's right to use the Unocal and 76 trademarks and credit card will be terminated. UNOVEN's general offices will be closed following completion of the transaction and its employees will be separated from the company. UNOVEN will cease to operate as an ongoing refining and marketing company.

The asset purchaser has designated its affiliate CITGO Petroleum Corporation ("CITGO") to administer the orderly termination of UNOVEN's contracts with customers. A termination notice period of one year after the closing of the transaction for continued use of the Unocal and 76 trademarks and credit card was negotiated as part of the transaction. CITGO will continue Unocal and 76 branded supply under your current agreements for the one year period following closing of the transaction. You will be contacted by a CITGO representative concerning ongoing operation of your marketership during the one year termination notice period.

Please refer to your Marketer Sales Agreement dated 1/1/95. As a consequence of the transaction described above, and as a result of the termination of UNOVEN's right to use the Unocal and 76 trademarks and credit card, UNOVEN hereby terminates and/or non-renews said Marketer Sales Agreement and does hereby terminate and/or non-renew any franchise relationship, effective as of May 1, 1998, one year from today's date. All agreements relating to

the Marketer Sales Agreement are also hereby terminated and non-renewed as of the effective date, May 1, 1998.

In compliance with the provisions of the Petroleum Marketing Practices Act, you are hereby notified that the grounds for the above action are that:

1. An event has occurred which is relevant to the franchise relationship and as a result of which termination of the franchise and non-renewal of the franchise relationship is reasonable.

2. UNOVEN has lost the right to grant the use of the trademark which is the subject of the franchise.

\*   \*   \*   \*   \*   \*

If you have any questions concerning this notice, please call Bob Butler at (847) 818-7183.

Stipulated Fact 19; Plfs.' Ex. 22.

11. The April 30, 1997 letter was posted by certified mail to Armada. Armada received the letter. *See* Stipulated Fact 20 and 25; Plfs.' Ex. 22.

12. On May 1, 1997, the UNO–VEN restructuring closed. CITGO began operating UNO–VEN's assets, including the Lemont, Illinois refinery, to provide Union 76 branded product to UNO–VEN distributors, such as Armada, through May 1, 1998. *See* Stipulated Facts 27 and 28.

13. Armada accepted petroleum products from CITGO subsequent to May 1, 1997. *See* Stipulated Fact 29.

14. Berry, on behalf of Armada, sent a memorandum to some of its customers indicating that Armada's franchise agreement with UNO–VEN was terminated on May 1, 1997, not the May 1, 1998 date provided in CITGO's and UNO–VEN's letters: "By now you should be aware that UNO–VEN 76 franchise agreement(s) were terminated effective May 1, 1997. The announcement of the UNO–VEN restructuring its refining and marketing assets by PDVSA U.S. were completed effective May, 1997." Plfs.' Ex. 24; Stipulated Fact 40.[11]

---

11. There is conflicting testimony concerning how many Armada dealers received this let-

ter. Armada contends that not all of its deal-

15. Armada's memorandum also provided:

> Most important is our position that UNO–VEN's statement for terminating your franchises, "loss of right to grant the use of the trademark which is the subject of the franchise."
>
> The most important aspect of this memo is to urge you NOT to sign any agreement with any competitor before you talk to us, for entering into a new BP franchise.
>
> Effective May 15, 1997, we (Armada Oil & Gas Co.) will not accept UNO–VEN or other credit cards processed thru UNO–VEN POS machines . . .

Plfs.' Ex. 24.

16. Berry testified that shortly after he sent this letter regarding the termination to some Armada-supplied dealers, he became aware that there were two separate April 30, 1997 letters, and that dealers continuing to operate as Union 76 dealers during the 12–month transition period could continue to accept Union 76 credit cards. 6/30/00 Allie Berry testimony at 40; *compare* Plfs.' Ex. 22 *with* Defs.' Ex. A.[12]

17. Armada's franchise with UNO–VEN was terminated effective May 1, 1998. *See* Stipulated Fact 41.

## IV. CONCLUSIONS OF LAW

1. The UNO–VEN Marketer Sales Agreement created a franchise agreement, which may be terminated only in accordance with the PMPA.

2. The PMPA was enacted "to protect franchisees from arbitrary or discriminatory termination or non-renewal of their franchises." *Massey v. Exxon Corp.,*

942 F.2d 340, 342–43 (6th Cir.1991) (citing *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1216 (7th Cir.1982)) (internal quotation marks omitted).

3. In enacting the PMPA, Congress recognized "the importance of providing adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions." S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 877. Thus, the Sixth Circuit has cautioned that the PMPA "constitute[s] a diminution of the property rights of franchisors and thus should not be interpreted to reach beyond its original language and purpose." *May–Som Gulf, Inc. v. Chevron U.S.A., Inc.,* 869 F.2d 917, 921 (6th Cir.1989) (citation omitted).[13] The Court thus balances the competing interests in resolving a claim brought under the PMPA.

4. The PMPA allows a franchisor to terminate or not renew a franchise based on certain enumerated grounds, provided that the termination also complies with PMPA's notice provisions. *See* 15 U.S.C. §§ 2802(b) & 2804.

5. Defendants, as the franchisee, have the initial burden of showing that the franchise has been terminated or not renewed. *Massey,* 942 F.2d at 342–43; *Evans v. Marathon Oil Co.,* 1999 WL 137633 at *2 (6th Cir. Mar.2, 1999); *accord* 15 U.S.C. § 2805(c). The burden then shifts to Plaintiffs, as the franchisor, to establish as an affirmative defense that such termination or nonrenewal was permissible under the PMPA. *See id.*

ers received the letter, but concedes that at least some did. *See, e.g.,* 6/30/00 Berry testimony at 41–43. Because this determination is irrelevant to the disposition of this case, the Court finds it unnecessary to determine how many dealers received this letter. Berry testified that at some point he realized that the information contained in his letter was incorrect. *See id.* at 42–44.

**12.** The second April 30, 1997 letter referenced unbranded UNO–VEN contracts, stating at

the beginning of the letter, in bold: "**Re: UNO–VEN Unbranded Products Contract**" Defs.' Ex. A (emphasis in original).

**13.** The Court is thus mindful that "in an age of increasing corporate competition, the major firms must retain the freedom to seek greater economic efficiency through corporate reorganizations, mergers, and acquisitions." *May–Som,* 869 F.2d at 921.

6. It is uncontroverted that Armada's franchise was terminated, and thus Defendants satisfy their initial burden. Accordingly, Plaintiffs must establish that the termination was permissible under the PMPA.

7. The PMPA lists the affirmative defenses available to a franchisor. *See* 15 U.S.C. § 2802(b)(2) and (b)(3). Section 2802(b)(2) provides, in relevant part:

(2) For purposes of this subsection, the following are grounds for termination of a franchise or nonrenewal of a franchise relationship . . .

(C) The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—

(i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title; or

(ii) not more than 60 days prior to the date on which notification of termination or nonrenewal is given, if less than 90 days notification is given pursuant to section 2804(b)(1) of this title.

§ 2802(b)(2)(C).

■ 8. Section 2802(c) provides twelve events that constitute events "relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable" consistent with § 2802(b)(2)(C)'s requirements. The list is not exhaustive. *See, e.g., Russo v. Texaco,*

*Inc.,* 808 F.2d 221, 225 (2d Cir.1986) (citations omitted). Courts may not deem the events expressly included in § 2802(c) as presumptively reasonable; rather, courts "must scrutinize the reasonableness of terminations even when an event enumerated in § 2802(c) has occurred." *Marathon Petroleum Co. v. Pendleton,* 889 F.2d 1509, 1512 (6th Cir.1989).

■ 9. The Notice identified two separate grounds purportedly justifying the termination under the PMPA:

In compliance with the provisions of the [PMPA], you are hereby notified that the grounds for the [termination of the Agreement effective May 1, 1998] are that:

1. An event has occurred which is relevant to the franchise relationship and as a result of which termination of the franchise and non-renewal of the franchise relationship is reasonable.

2. UNOVEN has lost the right to grant the use of the trademark which is the subject of the franchise.

Plfs.' Ex. 22.[14] Plaintiffs maintain that the UNO–VEN restructuring and the loss of the Union 76 trademarks constitute two separate bases for termination.

■ 10. In order to prevail, Plaintiffs need only demonstrate that one of its two bases for termination was proper under the PMPA. *See Thompson v. Amoco Oil Co.,* 903 F.2d 1118, 1120, 1122 (7th Cir. 1990). *Accord, Baker v. Amoco Oil Co.,* 761 F.Supp. 1386, 1391–92 (E.D.Wis.1991) (noting neither case law nor statutory authority requires "a franchisor to delineate each and every reason for termination or

---

14. Plaintiffs further suggest that they could have terminated Armada for reasons other than those stated in their April 30, 1997 Notice, such as Armada's failure to pay for some of the gasoline it received, and Armada's purported failure to meet contractual volume requirements after May 1, 1997. The Court finds, however, that these additional reasons are not relevant to the dispute at issue.

Plaintiffs must identify all reasons for the termination in the termination notice. Termination under the PMPA cannot be premised on reasons not articulated in the notice. *See* 15 U.S.C. 2804(c)(3)(A); *O'Shea v. Amoco Oil Co.,* 886 F.2d 584, 597–98 (3d Cir.1989) (ruling that franchisor may not assert new reasons for the termination not provided in notice of termination).

nonrenewal.”); *Esquivel v. Exxon Co.*, 700 F.Supp. 890, 893 (W.D.Tex.1988) (ruling that if one of franchisor's “reasons is legitimate, or true, the fact that the other reasons are somehow defective will not affect . . . nonrenewal” under the PMPA).[15]

11. Defendants acknowledge that Plaintiffs' Notice cites two reasons for termination under the PMPA. Defendants maintain, however, that the two reasons are identical and should therefore be considered one reason. The Court finds that although the reasons are closely related, they are nevertheless distinct. Under the PIRA, UNO–VEN's internal structure was drastically altered. One partner, Unocal, sold its 50% interest to its partner; thus PDV assumed 100% ownership of UNO–VEN's assets. Under the restructuring, UNO–VEN's trademark license agreement was terminated. All current UNO–VEN distributors were allowed to continue using the Union 76 trademarks for a one-year period after the PIRA was closed, until May 1, 1998.

12. The fact that Plaintiffs may have had other plans or expectations does not establish that its termination was based on sham or pretext provided that the reason asserted by Plaintiffs is valid and proper under the PMPA. *See, e.g., Baker*, 761 F.Supp. at 1391; *Gruber v. Mobil Oil Corp.*, 570 F.Supp. 1088, 1096 and n. 16 (E.D.Mich.1983).

13. Defendants failed to produce evidence that the reasons provided in the April 30, 1997 letter were not legitimate grounds upon which termination could be predicated. It is uncontroverted that the PIRA and Trademark License Agreement Amendment And Termination Agreement

altered UNO–VEN's structure, resulting in PDV assuming 100% ownership and terminating UNO–VEN's (and thus PDV's) license and ability to use the Union 76 trademarks. It is also undisputed that Unocal sold the Union 76 trademarks to Tosco.

14. A franchisee may rebut a franchisor's grounds for termination by producing evidence that the termination was based on illegitimate considerations. *See Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1469–70 (9th Cir.1993). Defendants' charge of “pretext” fails. Even if this Court accepted Defendants' claim of a hidden reason for the discharge, the hidden reason itself is a legitimate basis for terminating a franchise: Withdrawal from the geographic market. *See* 15 U.S.C. § 2802(b)(2)(E).

15. Defendants failed to produce evidence that would either directly or by inference establish that Plaintiffs wanted to avoid complying with the PMPA's notice requirements for withdrawal from the geographic market and chose to manufacture other reasons to justify the termination.[16]

16. Plaintiffs assert that termination is proper and reasonable due to the restructuring of the UNO–VEN partnership, pursuant to the May 1, 1997 closing—an event they contend is “relevant to the franchise relationship and as a result of which termination of the franchise . . . is reasonable.” § 2802(b)(2)(C). This Court agrees.

17. Although a business restructuring is not among the twelve events enumerated in § 2802(c), as this Court noted above, this list is not exhaustive.

---

**15.** Defendants argue that the “loss” of the trademark rights was a consequence of the restructuring, and does not constitute a separate reason for termination under the PMPA. Regardless of whether this Court construes Plaintiffs' reasons as a single reason or two separate reasons, it is uncontroverted that Plaintiffs must establish only one valid reason to prevail. *See Thompson*, 903 F.2d at 1120–22; *Baker*, 761 F.Supp. at 1391–92; *Esquivel*, 700 F.Supp. at 893.

**16.** As set forth in this Opinion, Defendants did not present evidence establishing that Plaintiffs withdrew from the geographic market in this case. PDV–MR has not withdrawn from the marketing of motor fuel in Michigan. The parties acknowledge that PDV–MR continues to market motor fuel under the CITGO brand—a brand other than Union 76.

862

18. If a franchisor bases termination on a non-enumerated ground, this Court carefully scrutinizes the reasonableness of the termination to determine whether the business decision was made in good faith and in the normal course of business. *See, e.g., Marathon Petroleum,* 889 F.2d at 1512 (noting that even if the event is enumerated under § 2802(c), the court must scrutinize the reasonableness of the termination); *Brach v. Amoco Oil Co.,* 677 F.2d 1213, 1222–23 (7th Cir.1982). This inquiry involves a subjective inquiry into the franchisor's good faith, as well as a determination of whether the franchisor's decision to terminate was made in the normal course of business. *See Brach,* 677 F.2d at 1222–23 (internal citations omitted). Thus, courts do not determine whether a given business decision is wise. *Id.* at 1223. This test is designed to protect a franchisee from arbitrary or discriminatory terminations, yet avoids an inquiry into the soundness of legitimate business decisions of a franchisor. *Id.* at 1222–23.

19. This Court finds that the restructuring of the UNO–VEN partnership was negotiated and undertaken in good faith in the normal course of business for valid economic reasons, articulated at trial. In an arms-length transaction that closed on May 1, 1997, PDV paid approximately $250 million to Unocal for its share of UNO–VEN's assets. The transaction was undertaken for legitimate reasons by both parties. The evidence at trial established that UNO–VEN was an economic drain on PDV, and Unocal had decided to exit the marketing segment of the oil business altogether. Termination of the UNION 76 franchises was necessary because, as the Notice indicated, as a result of the restructuring, UNO–VEN terminated its employees and ceased to operate as a marketing and refining company. The evidence also established that Unocal no longer had an economic reason to continue to grant UNO–VEN or PDV a license to use the UNION 76 trademarks in light of Unocal's decision to sell its ownership interest in UNO–VEN and exit the downstream mar-

ket throughout the country. The evidence additionally established that Unocal sold the UNION 76 trademarks to Tosco along with all of Unocal's West Coast refining and marketing assets.

20. As noted above, Armada did not adduce any evidence at trial to establish that UNO–VEN's restructuring was a sham or intended to be deleterious to Armada or any other franchisee. The LOI and the PIRA explicitly addressed the obligation to comply with the PMPA. The evidence at trial also showed that PDV retained an outside law firm with PMPA expertise to accomplish this requirement. Further, the record establishes that UNO–VEN went beyond the PMPA's minimum requirements in an effort to accommodate its terminated franchisees: It is uncontroverted that Plaintiffs provided all UNO–VEN distributors, including Armada, with UNION 76 product and continued their franchises until May 1, 1998—a full year after UNO–VEN's April 1997 notice of termination—when the PMPA requires only 90 days' notice prior to termination. *See* 15 U.S.C.A. § 2804(a)(2). Granting *all* its distributors a full year to make arrangements, a period much greater than required under the PMPA, is compelling evidence that Plaintiffs' decision to restructure its business was undertaken in good faith. There is no evidence to suggest that Plaintiffs acted in an arbitrary or discriminatory manner. All distributors received the one-year extension in an attempt to avoid disruptions in their respective businesses. *See Siecko v. Amerada Hess Corp.,* 569 F.Supp. 768, 771–72 (E.D.Pa.1983) (finding that a franchisor had acted in good faith because "this is not a case where the business judgment rationale can be viewed as a mere pretext for discriminatory treatment since there is nothing to dispute [franchisor's] proof that all stations were evaluated in the same way").

21. For all these reasons, this Court finds that the UNO–VEN restructuring was an event relevant to the franchise

relationship and a result of which termination of the franchise was reasonable. The Court also finds, for the reasons set forth later in this Opinion, that Plaintiffs' notice of termination was timely under the PMPA.

■ 22. Plaintiffs also maintain that termination is proper due to the loss of the use of the 76 trademarks.[17] Unocal sold the Union 76 trademarks to Tosco effective March 31, 1997. Under the PIRA and the Trademark License Agreement Amendment And Termination Agreement, Plaintiffs were granted a one-year license, until May 1, 1998, to use the 76 trademarks. The loss of right to use a trademark is specifically enumerated under § 2802(c)(6):

> (6) loss of the franchisor's right to grant the right to use the trademark which is the subject of the franchise, unless such loss was due to trademark abuse, violation of Federal or State law, or other fault or negligence of the franchisor, which such abuse, violation, or other fault or negligence is related to action taken in bad faith by the franchisor....

■ 23. This Court previously held that a voluntary divestiture of a trademark qualifies as a loss under § 2802(c)(6). *See* October 1, 1999 Order at 22–27. In addition, for the reasons set forth above, relating to the UNO–VEN restructuring, this Court finds that the loss of the trademark constitutes a valid and reasonable business decision. The evidence at trial established that UNO–VEN did not own the trademarks—Unocal granted a license to use the trademarks in 15 states. Unocal made an independent decision to sell the trademarks and its West Coast marketing and refining assets to Tosco. Defendants did not produce any evidence establishing that Unocal's and Tosco's business transaction was anything other than an arms-length transaction. Similarly, Defendants did not present evidence establishing that UNO–

VEN's, PDV's and Unocal's decision to retire the trademark license in conjunction with the PIRA was unreasonable or undertaken in bad faith. To the contrary, the evidence presented at trial established that Plaintiffs engaged in an arms-length business transaction. There was no evidence that Plaintiffs' decision was ill-motived or an arbitrary exercise of power. As such, the evidence supports only one conclusion: That termination based on the loss of the ability to use the Union 76 trademarks was reasonable. The Court cannot, and will not, supplant Plaintiffs' assessment of a legitimate business decision with the Court's assessment.

24. Finding that Plaintiffs' grounds for terminating the franchise constituted good faith business decisions undertaken in the ordinary course of business, the Court next determines whether Plaintiffs complied with the PMPA's notice provisions. Plaintiffs' April 30, 1997 letter to Armada constituted a notice of termination under the PMPA.

25. A notice under the PMPA must: (1) be written, (2) be posted by certified mail or personally delivered, (3) state an intention to terminate along with the reason or reasons for termination, (4) specify the date on which termination will take effect and (5) contain the Secretary of Energy's summary statement describing the PMPA which is published in the Federal Register. *See* § 2804(a) and (c).

26. The April 30, 1997 notice letter ("Notice") was posted by certified mail to Armada and contained: (a) a statement of intention to terminate the franchise, (b) the grounds of termination, (c) the effective date of the termination· and (d) the Secretary of Energy's summary statement describing the PMPA. *See* Stipulated Fact 20. Thus, Plaintiffs' Notice is in compli-

---

17. As this Court previously noted, under the PIRA, UNO–VEN's internal structure was drastically altered. As part of the restructuring, UNO–VEN's trademark license agreement was terminated. Furthermore, Unocal

sold its trademark rights to Tosco, and thus was not in a position to renew a license agreement for the trademarks. These factors, in combination, resulted in the loss of the right to use the 76 trademarks.

ance with § 2804, PMPA's notice provision.

27. Under the PMPA's notice provision, notice of termination must be provided "not less than 90 days prior to the date on which such termination or nonrenewal takes effect." § 2804(a). It is uncontroverted that this requirement was satisfied, as the termination became effective on May 1, 1998, one year after the date of the notice. *See* Stipulated Fact 21.

28. Plaintiffs' Notice was given pursuant to § 2802(b)(2)(C) and, as such, can be based only on events occurring not more than 120 days prior to the notice of termination. This provision states, in relevant part:

> The occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable, if such event occurs during the period the franchise is in effect and the franchisor first acquired actual or constructive knowledge of such occurrence—
>
> (i) not more than 120 days prior to the date on which notification of termination or nonrenewal is given, if notification is given pursuant to section 2804(a) of this title....

§ 2802(b)(2)(C)(i).[18]

29. Plaintiffs' Notice was given on April 30, 1997. Accordingly, Plaintiffs must not have acquired knowledge of the loss of the right to use the trademark prior to December 30, 1996.

30. Similarly, Plaintiffs must not have acquired knowledge of the UNO–VEN restructuring prior to December 30, 1996.

31. The evidence establishes that Tosco purchased Unocal's trademark rights on March 30, 1997. Thus, the notice of termination was timely under § 2802(C)(i).

32. The notice was timely as it related to the UNO–VEN restructuring.

Defendants contend that the termination was untimely, arguing that the rumors concerning a possible deal or the LOI should be regarded as the triggering event. The Court rejects Defendants' contention. Prior to the PIRA, Plaintiffs had not entered into a binding agreement. Thus, general "talks" concerning a possible restructuring, absent a binding agreement, could not provide a basis for terminating the franchise agreement. The basis for termination was provided in the PIRA. The PIRA was executed on April 11, 1997, and ultimately closed, with the approval of Unocal's and PDV's board of directors on May 1, 1997. The notice was timely as measured by the PIRA.

33. Based on the foregoing, this Court finds that the April 30, 1997 Notice satisfied the PMPA's notice requirements. Furthermore, because the Court found that Plaintiffs' voluntary divestiture of the Union 76 trademarks qualifies as a loss under § 2802(c)(6), and the Court found that the decision to terminate based on the UNO–VEN restructuring and the voluntary divestiture of the trademarks constitute a reasonable and ordinary business judgment consistent with the PMPA, *see Marathon Petroleum*, 889 F.2d at 1512, the Court thus concludes that Plaintiffs did not violate the PMPA when it terminated its franchises.

## V. CONCLUSION

In conclusion, the Court holds that Plaintiffs have established that the termination of Defendants' jobbership fully complied with the PMPA. Accordingly, Defendants are not entitled to the relief they requested, and judgment must be entered for Plaintiffs.

IT IS SO ORDERED.

---

**18.** The time limitations of the PMPA are intended to preclude a franchisor from basing termination upon "old and long-forgotten events." *See Gruber v. Mobil Oil Corp.,* 570 F.Supp. 1088, 1092 (E.D.Mich.1983) (quoting S.Rep. No. 95–731, 95th Cong., 2d Sess. 15, *reprinted in* 1978 U.S.C.C.A.N. 873, 892).